# CHARLESTON.

## MONONGAHELA AND WESTERN DREDGING CO. v. LLOYD E. SMITH.

Submitted March 21, 1916.     Decided March 28, 1916.

1. CONTRACTS—*Defense—Knowledge of Plaintiff.*

   It is no defense to an action for compensation for work done, or the use of implements in the performance thereof, at the instance, and upon the request, of the defendant, that a third party, was known by the plaintiff to have been obligated to the defendant, by contract, to perform it, or to have been liable in damages to him for not having performed it or for breach of a contract occasioning the work, and to have performed slight services in the procurement of the contract on which the action is based.     (p. 68).

2. APPEAL AND ERROR—*Order Setting Aside Verdict—Evidence.*

   A verdict for the defendant upon evidence disclosing such a relation, situation and contract is contrary to a clear and decided preponderance of the evidence, wherefore the action of the trial court in setting it aside is irreversible.     (p. 68).

Error to Circuit Court, Wood County.

Action by the Monongahela & Western Dredging Company against Lloyd E. Smith.     A verdict for defendant was set aside, and defendant brings error.

*Affirmed.*

*H. P. Camden* and *Moss, Marshall & Forrer,* for plaintiff in error.

*Dorr Casto* and *Wm. Beard,* for defendant in error.

POFFENBARGER, JUDGE:

Conceiving the verdict for the defendant, in this action of assumpsit for the recovery of $1,054.67, the contract price for the use of a dredge-boat and two scows, to have been contrary to the law and the evidence, the court set it aside, and the writ of error goes to the order so disposing of it. No instructions were asked for or given and the only assignment of error is predicated upon the order setting aside the verdict.

Having constructed in the bed of the Ohio River, at the city of Parkersburg, a filtration plant for the waterworks of said city, the defendant ascertained early in the year 1912, that the ice had pushed over on the filter beds a coffer dam embankment that had been left on one side thereof and so obstructed the flow of water and felt himself obligated to the city to remove the sand and debris so as to enable the filter beds to resume their functions and permanently restore the supply of water. He was under the impression that one C. D. Dotson, or a company managed by him, was under an obligation to him, Smith, to perform this work, but whether this supposed obligation arose out of a contract under which Dotson had done a lot of work in the installation of the plant or some subsequent contract, the evidence does not disclose.

On March 12, 1912, the Monongahela and Western Dredging Company, per W. T. Smoot, its general manager, wrote Mr. Smith as follows: "Dear Sir: Referring to the dredging that you desire to have done at the Parkersburg Water Supply, we beg to make you the following proposition; We will furnish Dredgeboat Central, 2 Dump Scows, and Steamboat, do dredging required, and take away and dispose of material dredged at such point as designated by the 'U. S. Government, for the sum of $12.00 per hour. The time of towing from Pittsburgh to point of work and returning to Pittsburgh after completion of work is to be included. No deductions are to be made for breakdowns where the same do not exceed one hour at any time. Payment for the work is to be made within ten days after bill rendered. The reason we designate the Dredgeboat Central is on account of the lock spud we have on that boat, which we can prevent from working down into the sand and gravel over the water pipes. We feel

that this would be much safer than the other boat. We are ready to go to work as soon as the Allegheny ice runs out and the river is at a stage that we can do the work. Trusting that we may have your early acceptance of this proposal, we are, Yours very truly,''

The reply to this letter is dated, April 6, 1912, and reads thus: ''Dear Sir: Owing to the high stage in the river, and on advice of my attorney that I am not fully relieved from Dotson, I have delayed writing you, thinking that I could have matters straightened up in a satisfactory manner, so as to avoid any confusion in the future. After notifying Mr. Dotson of my intention, he came back with a letter saying that he had equipment suitable to do this work. Whether that is true or not, my attorney says I will be compelled to call his bluff, and let him see what he can do. So for the present we will have to drop the matter of removal of gravel and sand at Parkersburg for the present, according to my talk with you over the 'phone since receiving your letter. I am sure that this only means more delay, but having a contract with Dotson, I realize it is not best for me to break it, and will no doubt have to call on you in the near future.''

On November 26, 1912, the correspondence was renewed, the dredging company writing as follows: ''In reply to conversation we had over the telephone last night, we beg to make you the following proposition: We will furnish you Dredgeboat Eastern and 2 Dump Scows for the sum of $8.00 per hour, to do the dredging which you desire to have done at Parkersburg, W. Va., time going from Pittsburgh, Pa., to point of work and returning to Pittsburgh to be included, and no deduction to be allowed for breakdowns where the same do not exceed one hour at any one time. You to furnish steamboat to tow the dredgeboat and scows from Pittsburgh to point of work, do towing in connection with dredging and tow dredgeboat and scows from point of work to Pittsburgh, Pa. Payment for this work is to be made within 15 days after completion of the same. There is not a steamboat at this point at the present time that could be hired. We understand there are two boats at Parkersburg, or near there,—a little boat by the name of Roberts and also

the Wayman. If you hire one of those boats to do the towing and send it after our dredge, we are ready to leave here at any time it arrives. If you can not make such arrangements, we do not know for sure when we could get the dredge down. The writer talked to Mr. Pope today, and he says that he thinks you could hire one of the above boats to do the towing. We are sorry we can not hire a steamboat here to take the dredge down, but, owing to the fact that the steamboats have had so much trouble with their boilers on account of bad water, it is next to impossible to get a boat to do any outside towing, as half of the small boats are having their boilers repaired at the present time. Call the writer on the telephone at his residence tomorrow evening at 6:00 o'clock.''

This proposition was modified by a letter dated November 30, 1912, saying: ''Supplementing our proposition of November 26 and confirming telephone conversation had with you by the writer, we beg to say that we will furnish Dredgeboat Eastern and 2 Dump Scows for the sum of $8.00 per hour, 10 hours to constitute a day's work, unless the dredge works overtime,—in which case we are to be paid at the same rate per hour. Time going from Pittsburgh, Pa., to point of work and returning to Pittsburgh, Pa., is to be paid for at the rate of $8.00 per hour, running time. No deductions are to be allowed for breakdowns of our Dredgeboat Eastern where the same do not exceed one hour at any one time; nor are any deductions to be made for high water, but deductions are to be made for low water and ice. As to the towing question, our proposition of November 26 stands as made. Our Dredgeboat Eastern is ready to start down the river as soon as the Steamer M. D. Wayman arrives here, in accordance with telegram from C. D. Dotson dated November 29. We would like to have your written acceptance of this proposition immediately on receipt.''

The last two of these letters were delivered to Dotson by Smith, and he retained them until the date of the trial of this case, but that the plaintiff was cognizant of this circumstance does not appear. Dotson may have been consulted about the subject matter of the telephone negotiations, but, if he was,

this fact is not shown to have been brought to the knowledge of the plaintiff.

Capt. H. B. Huling's steamboat, M. D. Weyman, was employed to tow the dredgeboat from Pittsburgh to Parkersburg and back and also to handle the scows, while the dredging was done. Dotson was present when Huling and his boat were employed. The defendant, admitting his presence at the time Huling was directed to go for the dredge, denies that he employed him to do so, but Huling and Dotson both say he made that contract. Dotson, however, sent the plaintiff a telegram, advising it of Huling's departure for Pittsburgh to bring the dredge down.

There was no written acceptance of the plaintiff's written proposition. The dredgeboat and scows were brought down and used. Dotson was at the place of work part of the time, but he explains that he was there looking after dredge work he was doing himself. The defendant's brother superintended the work done with the plaintiff's dredge and scows, in a general way, and he says he did it for both Dotson and the defendant. He says he had been Dotson's superintendent of work previously done for the defendant, at that place and then still in progress. When the work was completed, plaintiff's engineer was directed by the defendant to have Dotson appove his bill, but the latter declined to do so, denying that the work was his. The defendant says he told the plaintiff's manager the work was Dotson's.

The verdict could have rested on no other theory than that the defendant, in his negotiations with the plaintiff, was acting for Dotson or his company. The dredge and scows were furnished upon Smith's request. They were used in conformity with the offer of their use and the contemplated work was done with them. It is unbelievable that the jury thought nobody was liable. They may have been right in finding the work done was Dotson's, but, if it was and he had refused to perform it, the law would not permit them to say Smith could, on Dotson's behalf, employ another person to do that work for the latter, without authority from him so to do. Who made the contract and who expressly or impliedly agreed to pay for the work, were the questions submitted to them. As-

suming the existence of an obligation on Dotson's part to do this work for Smith, under some contract, the work was nevertheless Smith's as well as Dotson's and the crucial inquiry was, who requested the plaintiff to perform it? In the absence of such a request, there could be no recovery from anybody. The law implies a promise to pay for work done at the defendant's instance and request, but not for work done without solicitation, request or permission. It may be that Smith employed the plaintiff at Dotson's instance and request, to perform the work for him, but that has not been proved. Smith himself does not say so nor does he say he told the plaintiff Dotson would pay for it or was to be looked to for payment. He says no more than that Dotson ought to have ·done the work or had it done, and knew he was employing the plaintiff to do it and that the plaintiff knew it was Dotson's work. But the plaintiff also knew the work was primarily his own and that he only was conducting the negotiations with it for performance thereof or machinery to be used in its performance. His letter of April 6, 1912, indicated that he had been negotiating on his own behalf and would likely have to take the matter up again in the same way, on account of Dotson's alleged dereliction. He did take it up again and he does not say he apprised the plaintiff that his relation to the subject matter had been altered in any way.

There is conflict in the evidence, but it does not relate to the vital elements of the case. That Smith conducted the negotiations himself is undisputed. Dotson had previously negotiated with the plaintiff about another dredge for this work or some other, but he was not known to the plaintiff in the negotiations for the one used. The telegram Dotson sent was no part of the contract. It was not an acceptance of an offer made to him, for none had been so made. The dredge must have been delivered to Huling, not on the telegram, but on the proposition made to Smith at his request.

In view of these facts, we are of the opinion that the verdict was against a very heavy preponderance of the evidence in the plaintiff's favor, and that the trial court properly set it aside for that reason. Hence, the order complained of will be affirmed.                    *Affirmed.*